UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JENNIFER VARGAS, JISSEL GOMEZ, AND CHARMIQUE LINDO,<br><br>      Plaintiffs,<br><br>    v.<br><br>CRAB DU JOUR OF PELHAM LLC, AND STEVEN CHEN,<br><br>      Defendants. | ECF CASE<br><br>No.: _____<br><br><u>COMPLAINT</u><br><br>JURY TRIAL DEMANDED |

## NATURE OF THE ACTION

1. During their employment with Defendants, Plaintiffs were subjected to an egregiously hostile work environment, marked by routine, overtly discriminatory remarks, pervasive sexual harassment, and blatant retaliation. Defendant Chen openly expressed his discriminatory animus toward Black individuals, frequently referring to them using racial slurs, including calling them "monkeys" and using the n-word without hesitation. Chen also preyed upon his young, and in some instances underage, female employees through lewd, gender-based comments and non-consensual physical contact. When these women objected to his conduct, Chen retaliated by reducing their hours, engaging in wage theft, or terminating their employment altogether.

2. Plaintiffs therefore bring claims of discrimination based on race and gender, as well as retaliation based on protected activities. Defendant has violated 42 U.S.C. § 1981 ("§1981"); and the New York State Human Rights Law, New York State Executive Law § 296 *et seq* ("NYSHRL").

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1343, because Plaintiffs have asserted claims that arise under federal laws of the United States.

4. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 as those claims are so related to the federal claims in this action such that they form part of the same case or controversy.

5. Venue is proper in the Southern District of New York pursuant to 29 U.S.C. § 1391(b)(2) as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## PROCEDURAL PREREQUISITES

6. On October 9, 2025, Vargas and Gomez each filed a timely Charge of Discrimination ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq ("Title VII").

7. Once the EEOC has issued Vargas and Gomez a Notice of Right to Sue, Plaintiffs will amend this Complaint to include causes of action under Title VII.

## THE PARTIES

8. Plaintiff Jennifer Vargas is an Afro-Latina woman of Latin American and African ancestry, residing in the Bronx, New York.

9. Plaintiff Jissel Gomez is a Afro-Latina woman of Latin American and African ancestry, residing in the Bronx, New York.

10. Plaintiff Charmique Lindo is a Black woman residing in the Bronx, New York.

11. Defendant Crab Du Jour of Pelham LLC ("Crab Du Jour") is a domestic limited liability company that is organized and existing under the laws of the State of New York, which is licensed to practice in the State of New York and is located at 810 Pelham Parkway, Pelham, New York, 10803.

12. Upon information and belief, Steven Chen is an adult man residing in Staten Island, New York. Chen is the General Manager and Owner of Crab Du Jour.

## STATEMENT OF FACTS

13. In December 2021, Chen opened Crab Du Jour in Pelham, New York.

14. Chen employs various titles such as bartenders, servers and cooks to run Crab Du Jour. One of the group of employees Chen staffs are "Crew Members," a versatile position responsible for greeting guests, taking orders, delivering food, and maintaining cleanliness. They also assist with packaging to-go orders, restocking supplies, and supporting kitchen operations.

15. Crew Members, like all employees of Crab Du Jour, reported to Chen.

16. Chen staffs almost exclusively young women and girls as Crew Members, ranging in age from their early teens to early twenties.

17. Chen does not distinguish job responsibilities or requirements between his of age and underage female employees. For example, Chen hired an employee named Jaelin (last name unknown), as a Crew Member who was, upon information and belief,

about 15 or 16 years old. Despite her age, Chen assigned her to work as a bartender serving alcohol.[1]

18. Crab De Jour does not have a formal Human Resources ("HR") department, nor does it employ a dedicated HR representative or contract with an HR services provider. Rather any concerns employees have must be directed directly to Chen, without any real policy in place outlining recourse, if any.

Jennifer Vargas

19. In December 2021, Defendants hired Vargas as a Crew Member. At the time she was 17 years old.

20. This was Vargas's first full time job, and she was eager to get her professional life started.

21. The first few weeks were uneventful. The lack of any set of formal policies or training at Crab De Jour left her role feeling somewhat ambiguous. However, a quick learner, Vargas observed her fellow Crew Members in action and picked up the basics necessary to satisfactorily complete her job responsibilities.

22. After a month or two, Chen began to focus heavily on Vargas, striking up what felt like benign or friendly chatter while at work. At first, Vargas thought nothing of this, thinking her boss was merely acknowledging her hard work.

23. However, things changed in or about early 2022, when Chen approached Vargas while at work and whispered "I like you." Vargas was confused; she didn't know how to take the comment and wasn't interested in finding out. She ignored it.

---

[1] This is, of course, prohibited, as "[n]o person shall be employed to sell, dispense or handle alcoholic beverages in a retail establishment licensed for on-premises consumption unless they are eighteen years of age or older." N.Y. Alco. Bev. Control Law § 100(2-a) (McKinney 2023).

24. However, Chen escalated his behavior, regularly remarking to Vargas "I like you" multiple times per week. These comments were frequently coupled with comments about her appearance.

25. By this point, Vargas began to understand how Chen operated and his true intentions. Chen demonstrated a disrespect for women, often using the word "bitch" at work and referring to his female employees as "bitches," including Vargas.

26. Chen also sexualized his employees in front of Vargas. For example, he crudely commented about his underaged employee Jaelin's body, and how much he liked how "small" she was.

27. Further, Chen casually hurled racial epithets at work, particularly against Black people of a darker complexion, constantly using the word "nigger" and referring to himself, as an Asian man, a "yellow nigger," on an almost weekly basis.

28. Given all of this, Vargas decided she needed to distance herself from Chen. She made a conscious effort to ignore his comments, keep her head down, and focus on doing her job as best she could under the circumstances – because losing her job simply wasn't an option.

29. This worked for a period of time. However, over time, Chen became increasingly emboldened and more aggressive in his pursuit of Vargas.

30. In early July 2024, Chen asked Vargas to be his "sugar baby" while at work. Vargas dismissed it as if it was a joke and walked away.

31. Chen did not stop and, on July 16, 2024, texted Vargas: "how much does a sugar daddy have to spend?" Vargas ignored this.

32. On July 21, 2024, Chen texted Vargas that he wanted to talk to her "about some feelings lately." Vargas ignored this as well.

33. On August 7, 2024, while at work, Chen slapped Vargas's rear end without her consent. He said nothing and simply walked away.

34. Vargas felt violated and deeply shaken. Unable to focus on her work, she packed up and left before the end of her shift.

35. Later that day, Vargas realized that Chen had taken her headphones, forcing her to contact him – even though all she wanted was to put the day behind her.

36. Vargas messaged Chen asking him to return her headphones. He did not immediately respond. Instead, at 4 a.m. the following morning, he texted her, demanding: "Give me some sugar."

37. On October 14, 2024, while Vargas was working at the register, Chen approached her from behind and slapped her rear end again. He said nothing and walked away.

38. This assault was deeply distressing for Vargas. After years of enduring Chen's sexual comments and advances, it was now clear he felt entitled to violate her bodily autonomy. She was torn about what to do. Though she wanted to storm out, she couldn't afford to keep leaving work mid-shift, and quitting simply wasn't a financially viable option.

39. Around this time, Vargas began searching for new employment but was unable to find a job that paid a livable wage.

40. On February 22, 2025, Chen did it again, slapping Vargas's rear end while she was at the register, then walking without a word. Vargas did her best to suppress her emotions and continue working.

41. Later that night, a visibly intoxicated customer arrived, slurring her words and acting disorderly. Vargas seated the woman and attempted to take her order.

42. However, the customer demanded a different seat, complaining loudly that she didn't want to sit next to a Black person. Her remarks were loud enough for the adjacent Black customer to hear. Vargas was stunned.

43. Vargas excused herself from the table and reported the situation to hostess Ivy (last name unknown), explaining that the customer was belligerent, making racist comments, and refusing to sit next to a Black patron.

44. In response, Ivy instructed Vargas to accommodate the customer's racist request and move her to a different table. Vargas refused, saying it was "racist" and that she would not serve the customer. Ivy sternly told Vargas that she could "not refuse tables" and that she had no choice but to serve the customer.

45. With no viable alternative, Vargas returned to the table and, against her deeply held principles, moved the customer to a seat separate from Crab De Jour's Black patrons. This entire experience was deeply upsetting for Vargas.

46. From that point on, the intoxicated customer became increasingly hostile toward Vargas, seemingly aware of her discomfort. At end of the meal, the customer refused to pay. When Vargas informed her she would need to report the nonpayment, the customer shouted, "fuck you bitch" and threw her drink on her.

47. Vargas was stunned. As she tried to collect herself, another Crew Member rushed over to support her. The customer then initiated a physical altercation with the Crew Member. Eventually, the police were called, and the intoxicated customer was escorted off the premises.

48. On February 25, 2025, Vargas was the last employee working at the Crab Du Jour, aside from Chen. Before she could leave, she needed to restock the bar with liquor that was kept in the back of Chen's office.

49. After closing, Vargas entered Chen's office, where he was seated at his desk. She informed him that her shift was over and she was just there to collect liquor for restocking.

50. As Vargas gathered the liquor bottles, she heard Chen rise from his seat.

51. After collecting the bottles, Vargas tried to leave. However, before she could reach the door, Chen suddenly forced himself on her. He pushed his body against her, pinning her to the office door. Vargas was stunned and frightened about what Chen might do next.

52. Chen then attempted to force a kiss onto Vargas, which she avoided. Trapped between Chen and the door, she reached her right hand behind her to try and open the door. After turning the doorknob, Vargas realized Chen had locked the door and she could not get out.

53. Vargas began to panic as Chen's actions escalated. Unsure if anyone else was still in the restaurant and struggling to speak, Vargas gathered all the courage she could muster and shouted "someone is waiting for me outside!"

54. At that moment, Chen stopped. Without saying a word, Chen unlocked door and Vargas fled. As she left, she texted her boyfriend informing him that Chen had assaulted her.

55. Vargas was terrified to return to work, unsure how Chen would react. Vargas did not return to work for several days.

56. When she did return later that week, Chen avoided her entirely – refusing to make eye contact and leaving the room when she entered. This treatment made Vargas extremely anxious.

57. In March 2025, just days after the assault and without explanation, Chen reduced Vargas's scheduled work hours by half. It was obvious that Chen was retaliating against her objecting to his sexual harassment.

58. On April 11, 2025, Chen brought a scale to the back room of the restaurant and began instructing female staff members to weigh themselves. There was no job-related reason for this instruction. Given Chen's previously stated preference for "small" women, it was obvious the motivation behind this request was for Chen's own sexual gratification.

59. When Chen told Vargas to step on the scale, she initially refused. Chen persisted, telling her "in my culture, you would be overweight." Wanting to avoid confrontation, Vargas complied, though the experience left her feeling dehumanized and humiliated.

60. Following this incident, Vargas realized that she could not return to work. She had reached her breaking point: the persistent sexual harassment, racism, retaliation, and disrespect she had been subjected to had taken a severe emotional toll, and she feared for her well-being.

Jissel Gomez

61. In or around June 2022, Defendants hired Gomez as a cashier. At the time she was 17 years old.

62. While Chen initially hired Gomez as a cashier, her job responsibilities were vague and undefined. She was regularly required to perform duties typically assigned to Crew Member.

63. Within weeks of her employment, Gomez became aware of the discriminatory and hostile nature of the workplace, particularly under Chen's management. She routinely witnessed Chen sexually harass his female employees with inappropriate and racially charged comments.

64. For example, Chen demonstrated particular disdain for a waitress named Raven (last name unknown), a Black woman with a darker complexion. Approximately one month after Gomez began working, Chen began mocking Raven's hair, speculating that she wore a wig and making humiliating remarks such as, "Her wig is shifting."

65. Chen also routinely criticized Raven's clothing in front of Gomez and other staff. He instructed employees to "tell her" she looked bad, complaining, "What will a customer think when they see her?" and that she needed to "look better for the customers." Raven always dressed appropriately. Gomez never observed Chen target the physical appearance of lighter-skinned employees in the same way.

66. Around this same time, Gomez witnessed Raven ask Chen if she could offer a customer a free drink to encourage a larger tip. Chen denied the request, stating, "Black people don't pay."

67. During the summer of 2022, Gomez overheard Chen make repeated sexual comments about his female employees, including employees Vargas and Lindo, often focusing on their bodies.

68. Gomez also witnessed Chen slap female employees on their buttocks, usually bartenders, including Raven, while they were working behind the bar.

69. Gomez routinely saw Raven appearing emotionally distressed while at work.

70. In or around September 2022, Gomez noticed Raven looking particularly upset and asked if she was okay. Raven confided in her that working for Defendants had taken a serious toll on her mental health. She specifically cited Chen's open disdain for Black people, stating, "He doesn't like our kind."

71. Several weeks later, Raven resigned her position.

72. Gomez continued to work in this environment for several additional months. All the while, witnessing Chen's racism and sexual harassment towards his female employees.

73. Around the same time, Gomez began to notice Defendants' exploitative and unlawful wage practices. For example, Chen routinely cut her scheduled hours as punishment whenever she requested time off or attempted to take a break. She also observed unexplained discrepancies in her pay, leading her to believe that Crab Du Jour was withholding her wages without notice or justification.

74. In or around July 2023, an employee walked out on a table with an unpaid bill of approximately $300. After Gomez reported the incident to Chen, he told her that she would be responsible for paying the bill. Gomez was shocked. This was her first restaurant

job, and she did not realize it was unlawful for an employer to deduct such costs from an employee's wages.

75. Still, she pushed back, explaining there was nothing she could have done to stop the customer. Chen insisted it was her responsibility to chase after the customer, bring them back, and force them to pay. He then unlawfully deducted the full cost of the bill from Gomez's earned tips.

76. Following this incident Gomez resigned her position.

77. However, she soon found it difficult to secure another job that paid a livable wage.

78. As a result, in or around January 2024, Gomez returned to Crab Du Jour and resumed work as a Crewmember.

79. Shortly after returning, Gomez realized that nothing had changed. Chen continued to openly harass and discriminate against both employees and customers.

80. Chen continued to use the "nigger" on a weekly basis, often referring to himself as a "yellow nigger."

81. Chen also openly disparaged Black customers in Gomez's presence. He frequently made comments such as, "Black people always complain," and "Black people always want their money back," in reference to food or service issues.

82. On multiple occasions, when frustrated with a Black customer, Chen referred to them as a "Black monkeys," a deeply offensive racial slur that shocked Gomez.

83. In December 2024, while Gomez and another waitress, Deb (last name unknown) were bringing supplies into the kitchen, Chen approached them unprompted and stated, "I don't like Black girls, I like white girls and Spanish girls."

84. Gomez was stunned by the random and offensive nature of Chen's remarks. While his intent was unclear, it appeared he may have been making a sexual advance toward her. Although Gomez identifies as Afro-Latina, because of her lighter complexion and his previous comments to her Chen likely viewed her as Spanish then Black. This, coupled with his boldness in declaring his racialized sexual preferences, was deeply disturbing to Gomez.

85. Deb, who is Black with a darker complexion, immediately objected, asking, "Does that mean you don't like me because I'm Black?" Chen dismissed the comment and walked away without responding.

86. Gomez also witnessed Chen frequently insult female employees, calling them "stupid" and "bitches" for trivial mistakes – or no mistakes at all.

87. For example, Gomez observed Chen berate female crew members when customers sent food back, despite the fact that servers do not prepare the food, yelling, "You bitches can't do anything right!"

88. In or around June 2024, Chen began personally targeting Gomez, repeatedly calling her "stupid" over minor issues. On one occasion, Gomez confronted Chen and told him she would not tolerate being disrespected. Chen responded, "If you don't do stupid shit, I won't call you stupid."

89. In or around August 2024, when an employee named Jaelin relayed a customer complaint about the restaurant being too hot, Chen became enraged and yelled, "We can't do anything about it – are you fucking stupid?"

90. On September 20, 2024, Gomez went to Chen's office to raise concerns about her compensation. She pointed out that she had only been paid $170 for a prior week, which was inconsistent with the hours she had worked and what she was owed.

91. Gomez also complained about Defendants' failure to provide pay stubs, which made it impossible for her to verify whether she was being properly compensated.

92. Rather than address her concerns, Chen responded inappropriately, stating he was "looking for a sugar baby," implying Gomez could earn more money by engaging in a sexual relationship with him. Shocked and disgusted, Gomez said "no," left the office immediately, and called her boyfriend to report the incident.

93. Less than a week later, on September 25, 2024, Chen failed to pay Gomez her biweekly wages.

94. That same day, Gomez sent Chen three text messages inquiring about the missing payment, but he did not respond. She then called him directly and demanded an explanation.

95. During the call, Chen falsely claimed he had already paid her and blamed her bank for the issue. He abruptly ended the call.

96. Gomez then contacted her bank, which confirmed that no payment had been received or was pending. At that point, she realized Chen had lied to her.

97. Gomez attempted to follow up again via calls and texts, but Chen did not respond.

98. The following week, Chen finally paid Gomez the wages she was owed.

99. In April 2025, without any notice or explanation, Chen stopped scheduling Gomez for shifts. Although she was never formally terminated, this action effectively ended her employment.

Charmique Lindo

100. In September 2021, Defendants hired Lindo as a Crewmember.

101. From the beginning of her employment, Lindo observed that Chen treated her significantly worse than his non-Black employees and those with lighter skin tones.

102. For example, Chen scrutinized Lindo more closely than other employees, constantly watching for reasons to criticize her. When he found a perceived mistake, he would respond with angry outbursts, shouting disparaging remarks such as, "Bitch, you better clean up," and "Bitch, you better do your job."

103. Chen also scheduled Lindo less frequently than her non-Black coworkers without justification, which resulted in her earning substantially less wages.

104. In or about December 2022, while Lindo was working behind the bar, Chen suddenly appeared behind her and slapped her on the rear. Shocked, Lindo quickly turned around to see Chen standing behind her with a smile.

105. Lindo shouted "woah" to clearly signal her objection to Chen's unwelcome physical contact. Chen then walked away without saying anything further.

106. In or around August 2023, Chen told Lindo that someone had attempted to cash a fraudulent check from the Defendants at TD Bank. Without any evidence, Chen falsely accused Lindo of attempting to cash the check and terminated her employment.

## FIRST CAUSE OF ACTION
### Discrimination in Violation of § 1981
(against Crab Du Jour)

107. Plaintiffs repeat and reallege each and every allegation set forth above.

108. Defendant Crab Du Jour unlawfully discriminated against Plaintiffs in the terms and conditions of their employment by subjecting them to disparate treatment, a hostile work environment and/or unlawful termination on the basis of race in violation of § 1981.

109. As a result, Plaintiffs have suffered emotional distress and incurred compensatory damages, economic damages, attorney's fees, and costs.

110. Defendant willfully engaged in discriminatory practices with malice and/or reckless indifference to Plaintiffs' federally protected rights.

111. Plaintiffs are entitled to an award of emotional distress damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

## SECOND CAUSE OF ACTION
### Retaliation in violation of the § 1981
(against Crab Du Jour)

112. Plaintiffs repeat and realleges each and every allegation set forth above.

113. Defendant Crab Du Jour unlawfully retaliated against Plaintiffs in the terms and conditions of their employment on the basis of their legally protected activities, in violation of § 1981.

114. As a result, Plaintiffs have suffered emotional distress and incurred compensatory damages, economic damages, attorney's fees, and costs.

115. Defendant willfully engaged in discriminatory practices with malice and/or reckless indifference to Plaintiffs' rights.

116. Plaintiffs are entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees and costs.

### THIRD CAUSE OF ACTION
Discrimination in violation of the NYSHRL
(against all Defendants)

117. Plaintiffs repeats and realleges each and every allegation set forth above.

118. Defendants unlawfully discriminated against Plaintiffs in the terms and conditions of their employment by subjecting them to disparate treatment, a hostile work environment, and/or termination on the basis of their race and gender in violation of the NYSHRL.

119. As a result, Plaintiffs have suffered emotional distress and have incurred compensatory damages, economic damages, attorney's fees and costs.

120. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Plaintiffs' protected rights.

121. Plaintiffs are entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees, and costs.

### FOURTH CAUSE OF ACTION
Retaliation in violation of the NYSHRL
(against all Defendants)

122. Plaintiffs repeat and realleges each and every allegation set forth above.

123. Defendants unlawfully retaliated against Plaintiffs in the terms and conditions of their employment on the basis of their legally protected activities, in violation of NYSHRL.

124. As a result, Plaintiffs have suffered emotional distress and incurred compensatory damages, economic damages, attorney's fees, and costs.

125. Defendants willfully engaged in discriminatory practices with malice and/or reckless indifference to Plaintiffs' rights.

126. Plaintiffs are entitled to an award of compensatory damages, economic damages, punitive damages, attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, it is respectfully requested that the Court enter judgment for Plaintiffs against Defendants, jointly and severally, in amounts to be determined by the finder of fact, awarding economic, compensatory, and punitive damages, attorney's fees, and costs, and granting such other relief as may be just.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Dated: New York, New York
October 22, 2025

                                          LIPSKY LOWE LLP

                                          By: s/ Christopher H. Lowe
                                          Christopher H. Lowe
                                          Travis Pierre-Louis
                                          420 Lexington Avenue, Suite 1830
                                          New York, New York 10170-1830
                                          212.392.4772
                                          chris@lipskylowe.com
                                          travis@lipskylowe.com
                                          *Plaintiffs' Counsel*